**THE CASEY LAW FIRM, LLC**
Ryan Casey, Esq., State Bar No. 152824
ryan@rcaseylaw.com
20 NE Thompson Street
Portland, OR 97212
Tel: (503) 928-7611
Fax: (503) 345-7470

**MILSTEIN JACKSON FAIRCHILD & WADE, LLP**
Gillian L. Wade (*to apply pro hac vice*)
Sara D. Avila (*to apply pro hac vice*)
Marc A. Castaneda (*to apply pro hac vice*)
10250 Constellation Blvd., Suite 1400
Los Angeles, CA 90067
Tel.: (310) 396-9600
Fax: (310) 396-9635

*Attorneys for Plaintiff and the Class*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| Scott v, a consumer residing in Oregon, individually and on behalf of all others situated,<br><br>          Plaintiff,<br><br>   v.<br><br>Monsanto Company, a foreign corporation; Bayer Corporation, a foreign corporation, Bayer AG; a foreign corporation; and DOES 1 through 100, inclusive,<br><br>          Defendants. | Case No. 3:19-cv-1123<br><br>**CLASS ACTION ALLEGATION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff SCOTT GILMORE ("Plaintiff"), individually and on behalf of all others similarly situated, makes the following allegations based on his personal knowledge, and otherwise, upon information and belief:

## NATURE OF THE ACTION

1.    Plaintiff, by and through undersigned counsel, brings this action both on his own behalf and on behalf of the Class defined below, comprised of all individuals similarly situated within the State of Oregon, to redress the unlawful and deceptive practices employed by Defendants, MONSANTO COMPANY, BAYER CORPORATION, BAYER AG, and  DOES 1-100 (collectively herein referred to as "Monsanto Defendants" or "Defendants") in connection with its marketing and sale of its herbicide Roundup®, which contains the active ingredient glyphosate.

2.    Defendants sell various formulations of Roundup® which Plaintiff maintains are defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce without proper warnings and directions as to the dangers associated with its use.

3.    Defendants' reckless, knowing, and/or willful omission of the carcinogenic and/or otherwise harmful components to Roundup® products constitutes unlawful and deceptive business practices violate Oregon's Unlawful

Trade Practices Act, Or. Rev. Stat. §§ 646.605, *et seq*. (herein referred to as "OUTPA").

## JURISDICTION AND VENUE

4.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§1332(d), because there is diversity of citizenship between members of the proposed Class and Defendants. Defendants are either incorporated and/or have their principal place of business outside the state in which Plaintiff and members of the proposed Class reside. Furthermore, there are more than 100 Class Members and the amount-in-controversy exceeds $5,000,000 exclusive of interest and costs.

5.    This Court has personal jurisdiction over Defendants because Defendants are foreign corporations authorized to do business in Oregon and registered with the Oregon Secretary of State, and have sufficient minimum contacts with Oregon or otherwise intentionally avail themselves of the laws and markets of Oregon, through the promotion, sale, marketing and distribution of their Roundup® products in Oregon, to render the exercise of jurisdiction by the Oregon courts permissible.

6.    Venue is proper in this District under 28 U.S.C. §1391(b) and (c) because Defendants' improper conduct alleged in this complaint occurred in, was directed from, and/or emanated from this judicial district, because Defendants have

caused harm to Class Members residing in this district, and/or because Defendants are subject to personal jurisdiction in this district.

## **THE PARTIES**

7.     Plaintiff Scott Gilmore is an individual, a resident of Multnomah County, and a member of the Class alleged herein.

8.     Defendant MONSANTO COMPANY is a Delaware corporation, Oregon Secretary of State Registry No. 773242-84, in "active" status, with a principal place of business in St. Louis, Missouri. MONSANTO COMPANY is a multinational agricultural biotechnology corporation and the leading producer of glyphosate, a non-selective herbicide used to kill weeds that commonly compete with the growing of crops. Glyphosate is the active ingredient in MONSANTO COMPANY'S Roundup® products.

9.     Defendant BAYER CORPORATION is an Indiana corporation, Oregon Secretary of State Registry No. 085447-85, in "active" status, with a principal place of business in Pittsburgh, Pennsylvania. BAYER CORPORATION has derived substantial revenue from goods and products used in the State of Oregon.

10.     Defendant BAYER AG is a publicly held corporation headquartered in Leverkusen, Germany.

11.    Upon information and belief, BAYER AG is the parent/holding company of Defendants MONSANTO COMPANY and BAYER CORPORATION.

12.    BAYER AG acquired MONSANTO COMPANY on or about June 7, 2018.

13.    Upon information and belief, MONSANTO COMPANY is a wholly owned subsidiary of BAYER AG.

14.    Upon information and belief, Defendants DOES 1 through 1000 are subsidiaries, partners, or other entities that were involved in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup®. The true names and capacities of the Defendants sued herein as DOES 1 through 100, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Plaintiff will seek leave of Court to amend this Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

15.    "Roundup" refers to all formulations of Defendants' Roundup® products, including, but not limited to, Roundup Landscape Weed Preventer, Roundup Ready-To-Use   Killer III with Sure Shot Wand, Roundup Ready-To-Use

Weed & Grass Killer III with Comfort Wand, Roundup Ready-to-Use Weed & Grass Killer III with Pump 'N Go 2 Sprayer, Roundup Ready-To-Use Weed & Grass Killer III, Roundup Precision Gel Weed & Grass Killer, Roundup for Lawns Bug Destroyer, Roundup For Lawns Ready-to-Use, Roundup For Lawns$_1$ Ready-to-Spray, Roundup For Lawns$_3$ Ready-to-Spray, Roundup For Lawns$_2$ Concentrate, Roundup for Lawns Crabgrass Destroyer1, Roundup Ready-To-Use Max Control 365 with Comfort Wand, Roundup Concentrate MAX Control 365, Roundup Ready-To-Use Extended Control Weed & Grass Killer Plus Weed Preventer II with Comfort Wand, Roundup Ready-To-Use Extended Control Weed & Grass Killer Plus Weed Preventer II with Pump 'N Go 2 Sprayer, Roundup Ready-To-Use Extended Control Weed & Grass Killer Plus Weed Preventer II with Trigger Sprayer, Roundup Concentrate Extended Control Weed & Grass Killer Plus Weed Preventer, Roundup Ready-To-Use Poison Ivy Plus Tough Brush Killer with Trigger Sprayer, Roundup Ready-To-Use Poison Ivy Plus Tough Brush Killer with Comfort Wand, Roundup Concentrate Poison Ivy Plus Tough Brush Killer, Roundup Weed & Grass Killer Concentrate Plus, Roundup For Lawns$_2$ Concentrate, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer Super Concentrate, Roundup Concentrate MAX Control 365, Roundup Concentrate Extended Control Weed & Grass Killer Plus Weed Preventer, Roundup Concentrate Poison Ivy Plus Tough Brush Killer, Roundup

Pro No Leak Pump Backpack Sprayer (4 Gallon), Roundup Pro Sprayer for Commercial Use (2 or 3 Gallon), Roundup No Leak Pump Backpack Sprayer (4 Gallon), Roundup Pro No Leak Pump Backpack Sprayer with Stainless Steel Components and Deluxe Comfort Harness (4 Gallon), Roundup Multi-Use Home and Garden Sprayer (1, 2, or 3 Gallon), or any other formulation thereof containing the active ingredient glyphosate.

16.     Defendants engaged in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide Roundup, with the active ingredient glyphosate.

17.     Defendants transacted and conducted business within the State of Oregon that relates to the allegations in this Complaint.

18.     Defendants derived substantial revenue from goods and products used in the State of Oregon.

19.     Defendants purposefully availed themselves of the privilege of conducting activities within the State of Oregon, thus invoking the benefits and protections of its laws.

20.     Defendants advertise and sell goods, specifically Roundup, in Multnomah County, Oregon.

21.    Upon information and belief, Defendants did act together to design, sell, advertise, manufacture and/or distribute Roundup, with full knowledge and/or conscious disregard of its dangerous, defective, and carcinogenic.

## FACTUAL ALLEGATIONS

22.    Plaintiff purchased Roundup Weed & Grass Killer in or around December 2018 in Multnomah County, Oregon; as well as in or around late 2015 – early 2016 in Multnomah County, Oregon.

23.    When Plaintiff purchased the Roundup Weed & Grass Killer, the product label contained no indication that it or its ingredients contained any carcinogenic agents or posed the risk of cancer.

24.    Plaintiff disposed of the Roundup Weed & Grass Killer product in April 2019 when he learned Roundup products, including their active ingredient glyphosate, were likely carcinogenic.

25.    Had Plaintiff had known the carcinogenic properties of Roundup and its link to cancer at the time of purchase, he would not have bought it.

26.    Roundup contains glyphosate as the active ingredient, which has been used since 1974 and is spread worldwide, constituting the highest global production of all herbicides.

27.    Glyphosate is a nonselective herbicide that inhibits plant growth through interference with the production of essential aromatic amino acids.

28.    In recent years, and after substantial verdicts against MONSANTO COMPANY, the carcinogenic qualities of Roundup and glyphosate have begun to come to light.

## THE IARC CLASSIFICATION OF GLYPHOSATE

29.    The International Agency for Research on Cancer ("IARC"), an intergovernmental cancer agency within the World Health Organization ("WHO") of the United Nations, was tasked in 2015 with conducting and coordinating research into the causes of cancer it pertained to glyphosate.

30.    In March 2015, an IARC "Working Group" of 17 experts from 11 countries convened to evaluate several insecticides and herbicides, including diazinon, tetrachlorvinphos, malathion, parathion, and glyphosate. The evaluation was based on a cumulative review of all publicly available and pertinent scientific studies. Some of the studies pertained to people exposed to through their jobs, such as farmers. Others were experimental studies on cancer and cancer-related effects in experimental systems. The IARC Working Group's full monograph was published on July 29, 2015.

31.    In its monograph, the IARC Working Group classified glyphosate as a Class 2A herbicide, which means it is probably carcinogenic to humans. It concluded non-Hodgkin lymphoma was most associated with glyphosate exposure.

32.     The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

33.     The IARC's conclusions were consistent with scientific developments that had occurred in prior decades.

<u>EARLIER STUDIES ON ROUNDUP'S CARCINOGENIC PROPERTIES</u>

34.     As early as the 1980's, Defendants were aware of glyphosate's carcinogenic properties.

35.     On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") Toxicology Branch conducted a study to evaluate the potential oncogenic (i.e., potential to cause cancer) responses on mice. The group published a memorandum, which "classified Glyphosate as a Category C oncogen," meaning it is a possible human carcinogen.

36.     The findings of the 1985 EPA study were initially challenged by the EPA in 1991, which published a Memorandum entitled, "Second Peer Review of Glyphosate." The Memorandum changed glyphosate's classification to Group E (evidence of non-carcinogenicity for humans). Yet two peer review committee members did not concur with the conclusions, and the Memorandum itself "emphasized however, that designation of an agent in Group E is based on the available evidence at the time of evaluation and should not be interpreted as a

definitive conclusion that the agent will not be a carcinogen under any circumstances."

37.     However, further studies and developments indicated glyphosate indeed posed (and still poses) a definite carcinogenic effect on humans.

38.     In 1996, the New York Attorney General sued MONSANTO COMPANY for false and misleading advertising by touting its glyphosate-based Roundup products as, e.g.,  "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.

39.     On November 19, 1996, Monsanto entered into an Assurance of Discontinuance with  New York Attorney General, in which Monsanto agreed to alter the advertising, removing from advertisements that represent, directly or by implication, that the weed killers were biodegradable and environmentally friendly. Monsanto also agreed to pay $50,000 toward New York's costs of pursuing the case. At the time, New York was the only state to object to the advertising claims.

40.     In 1997, Chris Clements, *et al.* published a study entitled, "Genotoxicity of Select Herbicides in *Rana catesbeiana* Tadpoles Using the Alkaline    Single-Cell    Gel    DNA    Electrophoresis    (Comet)    Assay." Genotoxicity refers to the property of chemical agents which cause damage to genetic information within a cell causing mutations, which may lead to cancer.  In Clements' publication, tadpoles were exposed to various herbicides, including

Roundup, for a 24-hour period. Roundup-treated tadpoles showed "significant DNA damage when compared with unexposed control animals."

41.    In 1999, Lennart Hardell and Mikael Eriksson published a study entitled, "A Case–Control Study of Non-Hodgkin Lymphoma and Exposure to Pesticides," which consisted of a population-based case–control study in northern and middle Sweden encompassing 442 cases and twice as many controls was performed. Exposure data were ascertained by comprehensive questionnaires, and the questionnaires were supplemented by telephone interviews. The results indicated exposure to glyphosate and other herbicides yielded increased risks for Non-Hodgkin Lymphoma ("NHL").

42.    In 2002, Julie Marc, *et al.* published a study entitled, "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation." The study found Defendants' Roundup caused delays in the cell cycles of sea urchins. It further noted the deregulations of cell cycle checkpoints are *directly linked* to genomic instability, which can generate diseases and cause cancer. The findings led to the conclusion Roundup "causes changes in cell cycle regulation that may raise questions about the effect of this pesticide on human health."

43.    In 2003, A. J. De Roos, et al. published a study entitled, "Integrative assessment of multiple pesticides as risk factors for non-Hodgkin's lymphoma

among men," which "[r]eported use of several individual pesticides was associated with increased NHL incidence, including . . . glyphosate. A subanalysis of these 'potentially carcinogenic' pesticides suggested a positive trend of risk with exposure to increasing numbers."

44.    In 2004, Julie Marc, *et al.* published another study entitled, "Glyphosate-based pesticides affect cell cycle regulation." In that study, which tested Roundup 3plus on sea urchin eggs, determined "glyphosate-based pesticides are clearly of human health concern by inhalation in the vicinity of spraying," given the "molecular link between glyphosate and cell cycle dysregulation."  It observed, "roundup may be related to increased frequency of non-Hodgkin's lymphoma among farmers, citing the study by A. J. De Roos., *et al*.

45.    In 2008, Mikael Eriksson, *et al.* published a study entitled, "Pesticide exposure as risk factor for NHL including histopathological subgroup analysis," based on a case-control study of exposure to various pesticides as a risk factor for NHL. Eriksson's study strengthened previous associations between glyphosate and NHL.

46.     In 2009, France's highest court ruled that Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."

47.    Also in 2009, Nora Benachour and Gilles-Eric Seralini published a study entitled, "Glyphosate formulations induce apoptosis and necrosis in human umbilical, embryonic, and placental cells," which examined the effects of four different Roundup formulations on human umbilical, embryonic, and placental cells—at dilution levels far below agricultural recommendations. The study found the formations caused cell death in a few hours in a cumulative manner, caused DNA damage, and found that the formulations inhibit cell respiration. In addition, it was shown the mixture of the components used as Roundup adjuvants, particularly POEA (polyoxyethyleneamine) *amplified the action of the glyphosate*. The Roundup adjuvants actually changed human cell permeability and increased the toxicity of glyphosate alone.

## GLYPHOSATE-BASED HERBICIDES, INCLUDING ROUNDUP, ARE BANNED THROUGHOUT THE WORLD

48.    Following the IARC's report on glyphosate, several countries have issued outright bans or restrictions on glyphosate herbicides, including Roundup.

49.    In May 2015, the Netherlands banned all non-commercial use of glyphosate. *See* https://www.collective-evolution.com/2015/05/30/why-the-netherlands-just-banned-monsantos-glyphosate-based-herbicides/.

50.    In 2016, Italy adopted a law prohibiting the use of glyphosate in areas frequented by the public or by "vulnerable groups" including children and the elderly and in the pre-harvest phase in agriculture. *See* https://www.soilassociation.org/news/2016/august/italy-bans-toxic-glyphosate/.

51.    In June 2017, the Flemish government approved a ban on glyphosate for individual-use. *See* https://www.brusselstimes.com/all-news/belgium-all-news/43150/flemish-government-approves-ban-on-glyphosate-for-individuals/.

52.    In September 2018, the agriculture ministry of the Czech Republic stated the country would ban the blanket use of glyphosate as a weedkiller and as a drying agent. *See* https://phys.org/news/2018-09-czech-republic-restrict-glyphosate-weedkiller.html. The ban came into effect on January 1, 2019. *See* http://www.arc2020.eu/czech-out-this-roundabout-way-to-not-ban-roundup/.

53.    In October 2018, the Indian state of Punjab banned the sale of glyphosate. *See* https://www.thehindu.com/news/national/other-states/punjab-government-bans-sale-of-herbicide/article25314146.ece. And in February of 2019, the Indian state of Kerala followed suit, issuing a ban on the sale, distribution and use of glyphosate. *See* https://www.thenewsminute.com/article/kerala-government-bans-glyphosate-deadly-weed-killer-96220.

54.    In January 2019, French authorities banned the sale of Roundup following a court ruling that regulators failed to take safety concerns into account

when     clearing     the     widely     used     herbicide.    *See*
https://www.france24.com/en/20190116-weedkiller-roundup-banned-france-after-court-ruling. In April 2019, a French appeals court ruled Bayer's Monsanto business was liable for the health problems of a farmer who inhaled Roundup. *See* fhttps://www.insurancejournal.com/news/international/2019/04/11/523456.htm.

55.    In March 2019, Vietnam announced it has banned the import of all glyphosate-based herbicides. *See*  https://sustainablepulse.com/2019/03/25/vietnam-bans-import-of-glyphosate-herbicides-after-us-cancer-trial-verdict/#.XS-xCT9Kh9O.

56.    On July 2, 2019, Austria's lower house of parliament passed a bill banning all uses of glyphosate. According to recent reports it is likely to pass Austria's     upper     house     and     is     poised     to     become     law.    *See* https://www.reuters.com/article/us-austria-glyphosate/austrian-parliament-backs-eus-first-total-ban-of-weedkiller-glyphosate-idUSKCN1TX1JR.

57.    Several municipalities and regions in Spain and the United Kingdom have also banned glyphosate herbicides.

## MONSANTO LOSES THREE VERDICTS AFTER ROUNDUP IS FOUND TO CAUSE CANCER IN HUMANS

58.    On August 10, 2018, a unanimous California jury in *Johnson v. Monsanto Co.,* No. CGC16550128 (Cal. Super. Ct., Cnty. of S.F.) held MONSANTO COMPANY's Roundup and Ranger Pro herbicides were unsafe and

were a substantial factor in causing harm to the plaintiff.  The jury also found MONSANTO COMPANY failed to adequately warn customers of the risks associated with its Roundup and stronger Ranger Pro products, and that the company acted with malice or oppression.

59.    On March 27, 2019, a unanimous California jury in *Hardemon v. Monsanto Co.*, No. 3:16-mc-80232 (N.D. Cal.) found MONSANTO COMPANY liable for failing to warn Roundup could cause cancer, liable for negligence, and liable in a design defect claim.

60.    On May 13, 2019, a California jury found MONSANTO COMPANY likely caused a couple's cancer in *Pilliod v. Monsanto Co.,* No. RF17862702 (Cal. Super. Ct., Cnty. of Alameda). The jury found on a preponderance of the evidence Roundup was a significant contributing factor in causing the plaintiff's NHL.

## **TOLLING OF ANY APPLICABLE STATUTES OF LIMITATION**

61.    The existence of Roundup's carcinogenic properties and/or its potential to cause cancer was not factually established until August 10, 2018 when the jury in *Johnson v. Monsanto Co.* found Roundup was a substantial cause of cancer of the plaintiff's cancer and MONSANTO COMPANY failed to adequately warn customers of the risks associated with its Roundup.

62.     Prior to August 10, 2018, Plaintiff and Class Members were not on actual or constructive notice and thus could not discover that Roundup contained any carcinogenic agents and/or posed the risk of cancer.

63.     By concealing Roundup's carcinogenic properties to Plaintiff and the Class, Defendants have actively foreclosed Plaintiff and members of the Class from learning Roundup contained any carcinogenic agents and/or posed the risk of cancer.

64.     By reason of the foregoing, the claims of Plaintiff and the Class are timely under any applicable statutes of limitation pursuant to the discovery rule and the doctrine of fraudulent concealment.

## <u>CLASS ACTION ALLEGATIONS</u>

65.     Plaintiff brings this class action pursuant to Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all members of the following Class:

**All persons in the State of Oregon who purchased at least one of Defendants' Roundup products, for personal use and not for re-sale.**

66.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment.

67.    Specifically excluded from the proposed Class are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, successors, assigns, or other persons or entities related to or affiliated with Dollar General and/or its officers and/or directors, or any of them. Also excluded from the proposed Class are the Court, the Court's immediate family and Court staff.

<u>Federal Rules of Civil Procedure, Rule 23(a) Factors</u>

68.    **Numerosity**. Membership in the Class is so numerous that separate joinder of each member is impracticable. The precise number of Class Members is unknown at this time but can be readily determined from Defendants' records. Plaintiff reasonably estimates that there are tens of thousands of persons in the Class.

69.    **Adequacy of Representation**. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff has retained counsel highly experienced in complex consumer class action litigation and intends to prosecute this action vigorously. Plaintiff is a member of the Class described herein and does not have interests antagonistic to, or in conflict with, the other members of the Class.

70.    **Typicality**. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all members of the Class purchased Defendants'

Roundup products which fail to disclose the carcinogenic properties of Roundup and/or its active ingredient glyphosate.

71. **Existence and Predominance of Common Questions of Law and Fact.** There are numerous and substantial questions of law and fact common to all Class Members sufficient to satisfy Rule 23(a), and that control this litigation and predominate over any individual issues for purposes of Rule 23(b)(3). Included within the common questions are:

a) Whether Defendants' Roundup products contains carcinogenic properties and/or poses the risk of causing cancer;

b) Whether the active ingredient glyphosate in Defendants' Roundup products contains carcinogenic properties and/or poses the risk of causing cancer;

c) Whether the adjuvants contained in Defendants' Roundup products amplified the carcinogenic properties of Defendants' Roundup products and/or their active ingredient glyphosate;

d) Whether Defendants were aware its Roundup products contained carcinogenic properties and/or posed the risk of causing cancer;

e) Whether Defendants studied the effect of adding a warning label to their Roundup products disclosing their carcinogenic properties or potential cancer risks;

f) Whether Defendants studied or tested a potential warning label and the effect of such a label on consumer's perceptions;

g) Whether the existing labels on Defendants' Roundup products were adequate;

h) Whether Defendants' decision not to include a warning label to their Roundup products was willful;

i) Whether Defendants' decision not to include a warning label to their Roundup products was made recklessly and/or knowingly;

j) Whether Defendants misrepresented the safety and suitability of its Roundup products sold at its stores in Oregon;

k) Whether Defendants' conduct, as alleged herein, is unlawful under Oregon's Unlawful Trade Practices Act, Or. Rev. Stat. §§ 646.605, *et seq*.;

l) Whether the Plaintiff and the Class are each entitled to an award of actual damages or statutory damages of $200;

m) The proper method for calculating damages classwide;

n) Whether Plaintiff and the Class are entitled to injunctive relief requiring Defendants to disclose Roundup's carcinogenic properties and/or its risk of causing cancer;

o) Whether Plaintiff and the Class are entitled to attorneys' fees and costs, and in what amount;

p) Whether Plaintiff and the Class are entitled to declaratory and/or other equitable relief;

q) Whether Plaintiff and the Class are entitled to punitive damages.

<u>Federal Rules of Civil Procedure, Rule 23(b)(2) Factors</u>

72.    Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications with respect to individual member of the Class that would establish incompatible standards of conduct for Defendant.

73.    Injunctive relief is necessary to prevent further fraudulent and unfair business practices by Defendants. Money damages alone will not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendants from continuing to conceal the carcinogenic properties of their Roundup products and the cancer risks posed to consumers.

<u>Federal Rules of Civil Procedure, Rule 23(b)(3) Factors</u>

74.    **Common Issues Predominate**: As set forth in detail hereinabove, common issues of fact and law predominate because Plaintiff's claims are based on

a deceptive common course of conduct. Whether Defendants' conduct is likely to deceive reasonable consumers and violate Oregon's Unlawful Trade Practices Act, Or. Rev. Stat. §§ 646.605, *et seq.* is common to all members of the Class and are the predominating issues, and Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

75.    **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a)  Given the size of the claims of individual Class Members, as well as the resources of Defendants, few Class Members, if any, could afford to seek legal redress individually for the wrongs alleged herein;

b)  This action will permit an orderly and expeditious administration of the claims of Class Members, will foster economies of time, effort, and expense ad will ensure uniformity of decisions;

c)  Any interest of Class Members in individually controlling the prosecution of separate actions is not practical, creates the potential for inconsistent or contradictory judgments and would create a burden on the court system;

d) Without a class action, Class Members will continue to suffer damages, Defendants' violations of law will proceed without remedy, and Defendants will continue to reap and retain the substantial proceeds derived from its wrongful and unlawful conduct. Plaintiff and Class Members have suffered damages as a result of Defendant's unlawful and unfair conduct. This action presents no difficulties that will impede its management by the Court as a class action.

76.    **Notice to the Class:** Notice can be accomplished by publication for most Class Members.

77.    The Class Members have suffered economic harm and suffered injury as a result of Defendants' misconduct, in that each member purchased Roundup without knowing it contains carcinogenic properties and/or poses risk of cancer.

## CLAIMS FOR RELIEF

78.    Based on the foregoing allegations, Plaintiff's claims for relief include the following:

## FIRST CAUSE OF ACTION

**VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT**
**Or. Rev. Stat. §§ 646.605, *et seq*.**
**(on behalf of Plaintiff and the proposed Class)**

79.    Plaintiff incorporates by reference each preceding paragraph as though fully set forth herein.

80.    Plaintiff brings this claim under the OUTPA, <u>Or. Rev. Stat.</u> §§ 646.605, *et seq*., on behalf of himself and the Class, who were subject to Defendant's above-described unfair and deceptive conduct.

81.    As alleged hereinabove, Plaintiff has standing to pursue this claim as Plaintiff has suffered injury in fact in the form of an ascertainable loss of money or property as a result of Defendants' actions as set forth herein.

82.    Plaintiff is a "person" within the meaning of <u>Or. Rev. Stat.</u> § 646.605(4).

83.    Defendants are engaged in the sale of "goods and services," as defined by <u>Or. Rev. Stat.</u> § 646.605(6)(a).

84.    Defendants are engaged in "trade" or "commerce" within the meaning of <u>Or. Rev. Stat.</u> § 646.605(8), affecting consumers in Oregon and throughout the United States.

85.    Defendants engaged in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the Roundup, which contains the active ingredient glyphosate, and contains adjuvants, including POEA.

86.    In the course of their businesses, Defendants failed to disclose Roundup's carcinogenic properties and/or its potential to cause cancer, in violation of the OUTPA, <u>Or. Rev. Stat.</u> §§ 646.605, *et seq*.

87.    The OUTPA prohibits "unfair or deceptive acts conduct in trade or commerce ...." <u>Or. Rev. Stat.</u> § 646.608(1). Defendants violated the OUTPA because, among other reasons, they:

b.   "[c]aused likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of . . . goods";

c.   "[cause[d] likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another";

e.   "[r]epresented that. . . goods . . . have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the . . . goods or … do not have";

g.   "[r]epresented that . . . goods . . . are of a particular standard, quality, or grade, [when] the . . . goods . . . were of another";

i.   "advertise[d] . . . goods . . . with intent not to provide . . . goods . . . as advertised";

t.   "[c]oncurrent with tender or delivery of . . ., goods . . . fail[ed] to disclose any known material defect or material nonconformity";

u.   "[e]ngaged in . . . unfair or deceptive conduct in trade or commerce.

<u>Or. Rev. Stat.</u> § 646.608(1)(b), (c), (e), (g), (i), (t), (u).

88.     Defendants' representations and omissions were material in that they were likely to deceive reasonable consumers.

89.     Defendants concealed and continue to conceal material facts concerning the probable carcinogenic nature of its Roundup products. Plaintiff did not know Defendants' Roundup products posed the risk of cancer at the time he purchased the product.

90.     Indeed, had Plaintiff been aware of these material facts, Plaintiff would not have purchased Round Up Weed & Grass Killer.

91.     Defendants acted willfully in their violation of the OUTPA, by concealing Roundup was unsafe and/or posed a risk of cancer. Defendants' actions were done with conscious disregard of Plaintiff's rights and Defendants were wanton and malicious in their concealment.

92.     In the alternative, Defendants acted recklessly and/or knowingly in violating the OUTPA by concealing Roundup was unsafe and/or posed a risk of cancer.

93.     Defendants were aware in 2015 the IARC Working Group of the World Health Organization classified Roundup's active ingredient glyphosate as a Class 2A herbicide, meaning it is probably carcinogenic to humans.

94.     Defendants were also aware of the decades of scientific research and studies linking glyphosate to DNA damage, genotoxicity, genomic instability, cell cycle dysregulation, and NHL.

95.     Furthermore, and within the last year, Defendants have lost verdicts to cancer patients who established a causal link between the use of Roundup and their own cancer.

96.     Despite Defendants' access to these various studies, Defendants knew they valued profits over human safety and compliance with the law.  Defendants' wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the OUTPA because Defendants continue to design, manufacture, and sell Roundup products vehicles throughout the United States and the State of Oregon, containing the wrongful omissions described in this case.

97.     Plaintiff and other members of the Class have suffered injury in fact in the form of an ascertainable loss of money or property as a result of Defendants' unlawful conduct. Plaintiff would not have purchased Roundup had he known it was carcinogenic and/or posed a cancer risk.

98.     As a result of Defendants' failure to disclose Roundup's carcinogenic properties and/or its potential to cause cancer, Plaintiff would not have purchased Defendants' product. The significance, substance and nature of this omission supports a logical inference that the Class would not have purchased Defendants'

Roundup products had they known of the products' potential to cause cancer. As a result of these omissions, Plaintiff and the Class have also suffered an ascertainable loss in the form of a refund of the purchase price they paid for Defendants' Roundup products.

99.    In the alternative, Plaintiff and the Class paid more money for Defendants' Roundup product than they could have paid for other similar herbicides which do not contain glyphosate and/or do not pose a risk of cancer. Therefore, as a result of Defendants' unlawful concealment of Roundup's carcinogenic properties, Plaintiff and the Class suffered an ascertainable loss in the amount of the diminished value between the higher price paid for Defendants' Roundup product and the lower price that they could have paid for similar alternative herbicides, despite being deceived by Defendants' omissions.

100.    Pursuant to <u>Or. Rev. Stat.</u> § 646.638, Plaintiff and members of the Class may recover actual damages or statutory damages of $200, whichever is greater.

101.    Furthermore, and as authorized under this section, Plaintiff seeks injunctive relief compelling Defendants to disclose on each Roundup product, clearly and conspicuously, that its active ingredient glyphosate is a Class 2A herbicide, meaning it is probably carcinogenic to humans. Plaintiff and members of the Class shall be irreparably harmed if such an order is not granted.

102.    Plaintiff further seeks an order declaring Defendants have violated the OUTLA by failing to disclose Roundup's carcinogenic properties and/or its potential to cause cancer.

103.    Moreover, the aforementioned acts of Defendants were willful and in conscious disregard of Plaintiff's rights. Defendants' acts were done with the deliberate intent to secure profits from the Plaintiff and the Class while concealing the carcinogenic properties of their products and thus posing a cancerous risk to Plaintiff and the Class. This conduct represents a severe violation of societal interests sufficiently great and of a kind that the use of punitive damages is proper. Plaintiff is therefore entitled to punitive damages to punish Defendants' wrongful conduct and deter Defendants' future wrongful conduct.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and on behalf of the members of the Class defined herein, prays for judgment and relief on all Causes of Action as follows:

A.    An order certifying that the action may be maintained as a Class Action;

B.    An order enjoining Defendants from pursuing the policies, acts, and practices complained of herein and requiring Defendants to disclose on each Roundup product, clearly and conspicuously, that its active

ingredient glyphosate is a Class 2A herbicide, meaning it is probably

carcinogenic to humans;

C.     Actual damages or statutory damages of $200, whichever is greater

to Plaintiff and all members of the Class;

D.     Punitive damages;

E.     Pre-judgment interest from the date of filing this suit;

F.     Reasonable attorneys' fees;

G.     Costs of this suit; and

H.     Such other and further relief as the Court may deem necessary or

appropriate.

### JURY DEMAND

Plaintiff and the Class by counsel hereby request a trial by jury as to all

issues so triable.


Date: July 19, 2019                    Respectfully submitted,

                                       **THE CASEY LAW FIRM, LLC**


                                       */s/ Ryan Casey*
                                       Ryan Casey (OSB # 152824)
                                       ryan@rcaseylaw.com
                                       20 NE Thompson Street
                                       Portland, Oregon 97212
                                       Tel: (503) 928-7611
                                       Fax: (503) 345-7470

Gillian L. Wade (*to apply pro hac vice*)
Sara D. Avila (*to apply pro hac vice*)
Marc A. Castaneda (*to apply pro hac vice*)
**MILSTEIN JACKSON FAIRCHILD &
WADE, LLP**
10250 Constellation Blvd., Suite 1400
Los Angeles, CA 90067
Tel.: (310) 396-9600
Fax: (310) 396-9635

*Counsel for Plaintiff*